### FREEDMAN *v.* MARK.

1. CONTRACTS—CONSIDERATION—CANCELLATION OF DEBT—RE-EMPLOYMENT.

   Finding of circuit judge in suit commenced by judgment creditor's bill that judgment and debt represented thereby in favor of plaintiff partners, engaged as wholesale distributor of siding, was canceled when defendant, after an absence of some 2–1/2 years and after having made a statutory assignment for the benefit of creditors, became re-employed as a salesman for corporation, completely owned by the partners but engaged in retailing such siding, and was paid some $34,000 in commissions without demand for payment having been made, is not disturbed, the claim that the agreement to cancel the debt was without consideration being without merit (CL 1948, § 642.1 *et seq.*).

2. COSTS—BRIEFS.

   No costs are allowed appellees who filed no briefs on appeal.

Appeal from Wayne; Ferguson (Frank B.), J. Submitted October 15, 1958. (Docket No. 38, Calendar No. 47,721.) Decided December 2, 1958.

Judgment creditor's bill by Robert M. Freedman and Reuben M. Schulman, copartners doing business as Alsar of Michigan, against Gilbert Mark and Isa-

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 12 Am Jur, Contracts § 81.

belle Mark, jointly and severally, to reach assets claimed concealed and transferred by husband while insolvent. Bill dismissed. Plaintiffs appeal. Affirmed.

*Joel G. Jacob,* for plaintiff.

KELLY, J. Gilbert Mark and his wife are named as defendants. This opinion will refer to Gilbert Mark, solely, as defendant. On January 30, 1951, plaintiffs recovered a $2,115.96 judgment against defendant.

February 1, 1951, defendant executed a statutory assignment for the benefit of creditors.* The assignee realized $23,546.74, and plaintiffs received their proportionate share thereof.

Plaintiffs' writ of execution was issued on March 8, 1956, and returned unsatisfied.

July 12, 1956, plaintiffs filed their bill of complaint "to reach real estate, owned by defendants, husband and wife, as land contract purchasers as tenants by the entireties and to subject defendants' interest in said property to levy and sale in order to collect and satisfy a balance of $1,810.64."

The real estate refers to a home purchased by defendant and his wife on land contract 6 months previous to plaintiffs' judgment of January 30, 1951.

The trial chancellor dismissed plaintiffs' bill of complaint, concluding that the evidence sustained defendant's claim that the debt was cancelled.

Plaintiffs confine proof to the testimony of Gilbert Mark, who was called for cross-examination under the statute,† and the testimony of plaintiff Robert Freedman. No further testimony was offered by defendant.

---

* See CL 1948, § 642.1 *et seq.* (Stat Ann 1943 Rev § 27.2417 *et seq.*).—REPORTER.

† See CL 1948, § 617.66 (Stat Ann § 27.915).—REPORTER.

Defendant's testimony established that he first went to work for plaintiffs as a salesman of aluminum siding and that he worked and associated with plaintiffs for several years; that he finally was appointed president of plaintiffs' out-State branches, and that prior to the judgment he had become a dealer in his own behalf in Lansing and was obtaining aluminum from plaintiffs. The only explanation disclosing what transaction resulted in the judgment was a statement made by plaintiffs' attorney, as follows:

"*The Court:* What is the name—you're talking about Alsar Company and Alsar of Michigan?

"*Mr. Jacob:* Alsar Michigan was a wholesale distributor of siding. Alsar Company was and is a retail contractor for siding, buying, among other customers, from Alsar of Michigan.

"*The Court:* Now, the judgment is in the name of —?

"*Mr. Jacob:* That partnership.

"*The Court:* This partnership here, Alsar of Michigan?

"*Mr. Jacob:* That's correct.

"*The Court:* Now, who is Alsar Company?

"*Mr. Jacob:* A Michigan corporation, if your Honor please.

"*The Court:* Now, let's start all over again. Freedman & Schulman, copartners, doing business as Alsar of Michigan?

"*Mr. Jacob:* That's correct.

"*The Court:* And they obtained this judgment?

"*Mr. Jacob:* Correct, for merchandise sold and delivered, if that will help your Honor out. He testified he was a dealer in Lansing.

"*The Court:* While he was a dealer?

"*Mr. Jacob:* Yes, sold them merchandise and opened an account and then we sued him for it.

"*The Court:* All right, then it was after that that he went to work for someone?

"*Mr. Jacob:* Alsar Company.

"*The Court:* He said he went back to work for Alsar. Now, Alsar Company, you say?

"*Mr. Jacob:* That's correct.

"*The Court:* Now, who is Alsar Company?

"*Mr. Jacob:* That is a corporation of Michigan.

"*The Court:* And who are the principal stockholders?

"*Mr. Jacob:* Stockholders are the same people who were the partners, or who are the partners of Alsar of Michigan, but it is an entirely different setup. Never in the retail business.

"*The Court:* Was the copartnership dissolved?

"*Mr. Jacob:* No, your Honor.

"*The Court:* It was a going concern at the same time that the corporation was functioning?

"*Mr. Jacob:* That's correct."

Defendant testified that his friendship with plaintiff Freedman continued throughout the period he was working for plaintiffs and the years that followed the judgment when defendant moved to Detroit and worked for other employers.

Defendant testified that during his employment in Detroit by others he had lunch at the Wonder Bar with plaintiff Freedman and when Freedman suggested that he again associate with plaintiffs, he (defendant) stated:

" 'Well, what's the deal like?' And he explained it to me, and then I said definitely this, and I think Bob will bear me out on it. I said, 'If I come back there, and we start fresh.' 'In other words, there is nothing that I owe you or you owe me,' and that was the deal.

"I came back to work there and during that interim I was paid the sum of, I guess you all know it, approximately $34,000 for the period of time that I was there. * * *

"*Q.* You were with them, you allege in your answer from the 13th of August, 1953 to some time in November of 1954?

"*A.* That's correct. * * *

"*Q.* And during any time while you were with them during this period, was there any demand made upon you to pay this judgment in question?

"*A.* No, sir."

The answer as to why plaintiffs paid defendant $34,000 without mentioning defendant's payment to them of the $1,810.64 judgment is confined to plaintiff Freedman's testimony, as follows:

"*The Court:* Why didn't you get your money out of that $34,000, when you knew he was earning it?

"*A.* As a matter of fact, we felt that we had a reserve. As it turned out to be, we not only didn't have a reserve, but there was more money owing the Alsar Company than what we—rather, there's more money—the Alsar Company gave him more money than what his commissions sheet proved out to be, rather than having a reserve for it."

Defendant's statement, quoted above, is not denied, as is disclosed by the following testimony of Freedman:

"*Q.* State whether or not Mr. Mark told you at the Wonder Bar when you were having lunch one day that if he did—in 1953, prior to August—that if he did come back to work for your company that it would only be on the condition that the slate of the past were wiped clean?

"*A.* I do not recall any such conversation."

Plaintiff Freedman admits that when his partner, after termination of defendant and plaintiffs' working agreement, brought up the question of the payment of the judgment, defendant was surprised that plaintiffs were claiming that defendant owed them moneys on the judgment. The record sustains defendant's contention that he re-entered plaintiffs' employment with the agreement that the debt and judgment were cancelled.

Plaintiffs were the sole partners in the company

and the sole stockholders in the corporation, and we see no merit in plaintiffs' contention that, admitting the agreement, the contract should not be considered because of a lack of consideration.

Affirmed. No costs to appellees, who filed no brief.

DETHMERS, C. J., and CARR, SMITH, BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred.